UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 5:07 CR 86 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| PERCELL ROSS, | ) | |
| | ) | |
| Defendant | ) | <u>ORDER</u> |

Pending before the court is Defendant Percell Ross's ("Defendant") Motion to Suppress (ECF No. 10) and Supplemental Motion to Suppress (ECF No. 15) any evidence obtained as a result of alleged violations of his Fourth and Fifth Amendment rights. The court held a suppression hearing on June 4, 2007. Sergeant John Dittmore ("Sergeant Dittmore") testified on behalf of the government. For the reasons set forth below, Defendant's Motions to Suppress is denied.

## I. FACTUAL BACKGROUND

On December 23, 2006, Canton Police Department Sergeant Dittmore and other officers received a call from police dispatchers indicating that a burglary was in progress. The police dispatcher stated that the suspects consisted of three men, one of whom was wearing a brown jacket and had an afro-style haircut. Sergeant Dittmore was in the area and responded to the scene immediately. A few minutes later, Sergeant Dittmore saw three men walking together on an otherwise deserted street. One of the men was wearing a brown jacket and had an afro-style haircut.

Sergeant Dittmore, wearing a police uniform but driving an unmarked sports utility vehicle, drove up over the curb toward the three men and cut them off. At the same time, a marked police cruiser pulled up behind the three men. Sergeant Dittmore exited his vehicle and identified himself. Two of the three men stayed in place on the sidewalk and were later released without incident. Defendant, however, fled the scene. Sergeant Dittmore began chasing Defendant, shouting, "Stop, police." Defendant ran until he reached a large stockade fence. Sergeant Dittmore then tackled Defendant, handcuffed him, and turned him over to other police officers. The officers searched Defendant and recovered a .22 caliber round of ammunition and a small amount of crack cocaine. Defendant then indicated to the officers that he wished to speak with Sergeant Dittmore.

Sergeant Dittmore approached Defendant, who was seated in the back seat of the police cruiser. Defendant told Sergeant Dittmore that he wanted to become a confidential informant to "work his case off" and informed Sergeant Dittmore that he had previously been a confidential informant in three states. Sergeant Dittmore immediately gave Defendant a *Miranda* warning. Defendant mentioned the name of a drug dealer with whom he was acquainted to Sergeant Dittmore. Sergeant Dittmore recognized the name and, based upon this information, took Defendant to police headquarters to debrief him.

At the police station, Sergeant Dittmore explained that Defendant would have to make a full disclosure of criminal activities that he and others were involved in if Defendant wished to be considered reliable. Sergeant Dittmore told Defendant that if he caught Defendant lying at any time, then all deals would be off, and Defendant could not work as a confidential informant. Defendant stated that he understood and still wished to cooperate. During direct examination, Sergeant Dittmore stated that at no time did he tell Defendant that he would get any sort of benefit if he

cooperated with the police. However, during cross-examination, Sergeant Dittmore indicated that the police would not charge Defendant with drug abuse and that he could probably go home that evening if Defendant demonstrated his reliability.

During the debriefing, Defendant told Sergeant Dittmore that he possessed a .22 caliber rifle in his home. When Sergeant Dittmore asked Defendant about a receipt found on Defendant's person which indicated that Defendant had purchased a box of fifty rounds of Smith & Wesson .38 caliber special ammunition approximately an hour before the police made contact with him, Defendant stated that he bought the ammunition for a young boy and no longer had it. Defendant indicated he did not know the boy's name.

Aware that a set of car keys was found on Defendant's person, Sergeant Dittmore asked Defendant where the vehicle was located. Defendant said it was parked in a garage not too far away from where the police had picked up Defendant. Sergeant Dittmore asked Defendant if the police could search the vehicle to determine whether it contained narcotics. Defendant assured Sergeant Dittmore that there were no narcotics in the car, but indicated he was concerned the presence of police in the vicinity of the vehicle might "blow his cover" as a confidential informant. Sergeant Dittmore assured Defendant that the police and Defendant would travel in an unmarked car to Defendant's vehicle. After receiving this reassurance, Defendant consented to taking the police to his car and allowing them to search it.

As agreed, Defendant and plainclothes police officers drove in an unmarked car to Defendant's vehicle, and Sergeant Dittmore followed in a separate car. However, Defendant's vehicle was not, as Defendant had earlier indicated, parked in a garage. Instead, it was parked in the back of an apartment building approximately two or three doors down from the location of the

attempted burglary. At this point, Sergeant Dittmore concluded that Defendant was unreliable and had not been truthful. The police officers searched Defendant's vehicle and found a loaded Raven .25 caliber pistol, an unloaded .38 caliber revolver, and multiple false identification cards. The basis for the search was Defendant's consent and, alternatively, probable cause to believe there was contraband inside the vehicle. It had been abandoned by Defendant and others when the police arrived, Defendant had crack cocaine on his person, and Defendant lied about the location of the vehicle. Defendant did not tell the police about the weapons or the identification cards during the debriefing, and he exclaimed to the officers at the scene that he believed that the other two men had gotten the weapons out of the vehicle while Defendant was at the police station. Sergeant Dittmore determined that he could not allow Defendant to work as a confidential informant because he was unreliable and should be charged with possession of crack cocaine and various firearms charges.

Based on Defendant's statement during the debriefing at the police station that he had a .22 caliber rifle at home, the police went to Defendant's residence. Defendant's wife let the police officers into the home, but she refused to consent to a search. The police subsequently obtained a search warrant based on Defendant's admission that he had a firearm in the house. Pursuant to the search, the police recovered the following items: a .22 caliber rifle; a 20 gauge shotgun; over 900 rounds of ammunition of various calibers; scales; and unmarked pills. With the exception of the .22 caliber rifle, Defendant did not disclose any of these items to the police during the debriefing. The government subsequently indicted Defendant, who had previous felony convictions, for possession of firearms in violation of 18 U.S.C. Section 922(g)(1). (ECF No. 1.)

## II. LAW AND ANALYSIS

### A. *Terry* Stop

Defendant argues that his detention was unconstitutional because "no evidence was presented to show that the Canton Police radio call had credible information that [Sergeant] Dittmore could rely on for a reasonable suspicion." (Def.'s Supp. Mot. to Suppress at 3-4.) For the foregoing reasons, Defendant's argument is not well-taken.

The Fourth Amendment prohibits unreasonable searches and seizures. Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause. However, under the *Terry* exception to the warrant requirement, an officer may, consistent with the Fourth Amendment, conduct a reasonable, investigatory stop, also known as a "Terry stop." First, a court must examine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." *United States v. Caruthers,* 458 F.3d 459, 464 (6th Cir. 2006) (quoting *United States v. Garza,* 10 F.3d 1241, 1245 (6th Cir. 1993)). Second, if the stop was proper, the court must then "determine whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.* (quoting *Garza,* 10 F.3d at 1245)).

The first part of the analysis, whether the police had reasonable suspicion to justify the investigative detention in light of the totality of circumstances, requires "the detaining officers to have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (quoting *United States v. Cortez,* 449 U.S. 411, 417-18 (1968)). In *Caruthers,* 458 F.3d at 468, the Sixth Circuit held that, where "an individual, whose general appearance and location matched the description given in the anonymous shot-fired call, fled and made furtive

-5-

movements when approached by the police late at night in a high-crime area – [there was] reasonable suspicion to conduct a *Terry* stop." The court further noted that "this and other courts have concluded likewise in similar circumstances." *Id.* (citing *United States v. McAllister,* 31 Fed. App'x 859, 864-65 (6th Cir. 2002); *United States v. Williams,* 403 F.3d 1188, 1193-94 (10th Cir.), *cert. denied,* __ U.S. __, 126 S. Ct. 178 (2005); *United States v. Sims,* 296 F.3d 284, 286-87 (4th Cir. 2002); *United States v. Dupree,* 202 F.3d 1046, 1049 (8th Cir. 2000)).

Here, Defendant's argument that the anonymous call relayed through the police dispatcher was not sufficient to justify a reasonable suspicion is unavailing because the evidence shows Sergeant Dittmore had a reasonable suspicion that was based on a totality of the circumstances similar to those that existed in *Caruthers* and was not simply based on the dispatcher's call. He was not chosen randomly. Defendant matched the description given in the anonymous call. He was observed with two other men, and one of the men was wearing a brown jacket and had an afro-style haircut. The men were observed within one street of the alleged break-in, and they were the only individuals on the otherwise-deserted street at a late hour. Of the three men, only Defendant fled when Sergeant Dittmore identified himself as a police officer and approached the men to ask for identification. Defendant did not stop when Sergeant Dittmore chased him and shouted, "Stop, police." Accordingly, based upon the totality of the circumstances, Sergeant Dittmore had a reasonable suspicion to justify the investigative detention of Defendant.

Secondly, the court must determine whether the degree of intrusion was reasonable, *i.e,* whether: (1) it was sufficiently limited in time; and whether (2) the investigative means used was the least intrusive means reasonably available. Defendant does not argue that the degree of intrusion exercised by Sergeant Dittmore was unreasonable. Regardless, the court finds that, in light

of the fact that Defendant fled and Sergeant Dittmore was forced to chase Defendant, it was not unreasonable for Sergeant Dittmore to tackle, frisk, and handcuff him. *See Caruthers,* 458 F.3d at 468-69 (holding that "[g]iven that Caruthers had already demonstrated that he was a flight risk, it was reasonable for Officer Stocks to take steps to avert another attempted escape while he conducted this search."). Accordingly, the court finds that Sergeant Dittmore had reasonable suspicion to detain Defendant.

### B. Defendant's Statements

Defendant argues that the statements he made in the debriefing regarding the weapon in his home was not voluntary and therefore was obtained in violation of the Due Process Clause. For the foregoing reasons, the court finds that the police did not engage in objectively coercive behavior and therefore Defendant's confession was voluntary. Alternatively, even if Sergeant Dittmore's statement that Defendant would not be prosecuted on a drug abuse charge was objectively coercive, the court does not find, upon examining the totality of the circumstances, that Defendant's will was overborne or that Sergeant Dittmore's behavior was the motivating reason for Defendant's statements.

In determining whether a confession has been elicited by unconstitutional means, a court should "look to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." *United States v. Johnson,* 351 F.3d 254, 260 (6th Cir. 2003) (quoting *United States v. Mahan,* 190 F.3d 416, 422 (6th Cir. 1999)). Relevant factors "include the defendant's age, his level of education and intelligence, whether he was advised of his rights, whether he suffered physical punishment and the length of the questioning he endured." *United States v. Craft,* 495 F.3d 259, 263 (6th Cir. 2007) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218,

226 (1973)). The Sixth Circuit has established three requirements for a finding that a confession was involuntary due to police coercion: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Johnson,* 351 F.3d at 260 (citing *Mahan,* 190 F.3d at 416).

### 1. Police Activity Not Objectively Coercive

Police promises of leniency may be objectively coercive "if they are broken or illusory." *United States v. Johnson,* 351 F. 3d 254, 262 (6th Cir. 2003) (citing *Williams v. Withrow,* 944 F.2d 284 (6th Cir. 1991)). An illusory promise "is a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action." *Johnson,* 351 F.3d at 262 n.1. The court in *Johnson,* 351 F.3d at 254, held that the promise not to arrest the defendant's half-brother if the defendant turned himself in and admitted the drugs belonged to the defendant, "was not an illusory promise because it actually committed the police to take a specific course of action in return for [the defendant's] cooperation, as surely [the defendant] would be arguing here if the policy had prosecuted [the defendant's half-brother]." Moreover, the police's promises in *Johnson* were not broken because they did not arrest the defendant's half-brother. *Id.*

In *Williams v. Withrow,* 944 F.2d at 286, the court held that the police's illusory promise of leniency to the defendant, *i.e.,* that if the defendant "was a witness, and he had no active part in the crime, and that could be confirmed by polygraph, that he would not be charged," coupled with the threat of immediate arrest if the defendant failed to cooperate, was objectively coercive. In light of the "entire course of police conduct," *id.,* the court found that the defendant's confession had

-8-

been involuntary.  The *Williams* court, however, distinguished the illusory promise at issue from promises of leniency made by the police to police informants.  The court noted, 944 F.2d at 289, that "[t]he necessity of foregoing the prosecution of an informant in order to convict the ringleaders is an altogether different situation from the deliberate inducement of inculpatory statements through illusory promises of leniency."

Here, the promise not to charge Defendant with drug abuse was not illusory because, once the Defendant satisfied the condition precedent of demonstrating his reliability, the police were committed to foregoing the prosecution of Defendant based upon his confidential informant status. Moreover, the police did not break its promise not to charge Defendant with the drug abuse *if and when Defendant proved himself to be reliable* because Defendant's actions demonstrated his unreliability.  As a result, Defendant failed to satisfy a condition precedent to the police performing on their promise.  Defendant demonstrated his unreliability by, for example, not telling the police where his car was actually parked, telling the police that he had given the .38 ammunition to an unknown teenager when the ammunition was actually discovered in his car, and failing to disclose the existence of shotgun in his car.  Accordingly, the police did not engage in objectively coercive behavior in regard to Defendant because their promises to him were not illusory or broken.

### 2. Police Activity Did Not Overbear Will and Was Not Crucial Motivating Factor For Statement

Alternatively, even if the court found that the police made objectively coercive promises to Defendant, the court would still not find that Defendant's statements were involuntary because the police promises did not overbear Defendant's will and were not the crucial motivating factor for Defendant's statements. Rather, Defendant's statements were demonstrably within his own

contemplation when he asked to speak to Sergeant Dittmore and then volunteered to become a confidential informant.

As the Sixth Circuit noted in *United States v. Starks,* No. 95-4105, 1997 U.S. App. LEXIS 12016, at *13 (6th Cir. 1997), *Williams* "clearly did not hold that promises of leniency automatically render involuntary every confession so obtained," and the totality of circumstances must be considered. In *Starks,* the court noted that, even crediting the defendant's claim that the officers extracted his confession through the use of threats and promises, the totality of circumstances did not suggest that promises or leniency or harsh treatment were sufficient to overbear or did overbear Defendant's will or was the crucial motivating factor in deciding whether to confess. *Id.* For example, the district court found that the defendant was intelligent, he had previous experience with arrests, he had been informed of his constitutional rights, the questioning was not inordinately lengthy, and no coercive tactics, such as sleep deprivation accompanied the interrogation.

In deciding whether the police's activities induced the defendants in *United States v. Wrice,* 954 F.2d 406, 411 (6th Cir. 1992), to make incriminating statements to a prosecutor, the Sixth Circuit observed that the defendants, while in custody, asked to speak to a prosecutor. The court stated that, "from this fact, it is reasonable to infer that the ensuing discussion about sentence reduction and undercover cooperation was within the contemplation of the defendants when they asked to speak to a prosecutor, and not the result of illegitimate efforts to coerce them to confess." *Id.*

Here, the totality of the circumstances shows that Defendant's will was not overborne by the police, and that the police's conduct was not the crucial motivating factor in his making inculpatory statements. Similar to the defendants in *Wrice,* Defendant asked to speak to Sergeant Dittmore at the arrest scene. Defendant volunteered to become a confidential informant, stating that he had

previously been a confidential informant in three other states. Based on Defendant's past experience as a confidential informant, Defendant knew he would have to make full and frank disclosures of his criminal activities in order for the police to use him as a confidential informant. Therefore, Defendant's initiation of contact with Sergeant Dittmore shows that, like the defendant in *Wrice,* it was within his contemplation to make inculpatory statements, and these statements were not the result of any illegitimate effort by Sergeant Dittmore to coerce him to confess. Moreover, Defendant had ample experience with arrests in the past. Like the defendant in *Starks,* Defendant received *Miranda* warnings, Sergeant Dittmore's questioning of Defendant at the station house was not inordinately lengthy, and Defendant was not a victim of coercive police tactics, such as sleep deprivation. Accordingly, the court finds that Defendant's incriminating statements were voluntary.

### C. Search of Defendant's Vehicle

In his suppression motion, Defendant claims that he did not voluntarily consent to the search of his vehicle. In his supplemental suppression motion, Defendant contends that the warrantless search of the car was improper because "it does not fit into the search incident to arrest exception to the Fourth Amendment's warrant requirement." (Def.'s Supp. Br. for Mot. to Suppress at 5.) The government asserts that the warrantless search of the vehicle was proper because Defendant voluntarily consented to the search while in custody and subsequently led the police to the vehicle. For the foregoing reasons, the court finds that Defendant voluntarily consented to the searching of his car, and therefore the court need not address Defendant's alternative argument that the search was not incident to an arrest.

The Sixth Circuit has held that "the law is clear that custody is not enough to nullify an

otherwise valid consent." *United States v. Kirkpatrick,* No. 97-5583, 1998 U.S. App. LEXIS 30755, at *10 (6th Cir. 1998). Rather, "a defendant in custody can validly consent to a search as long as it is given voluntarily." *Id.* (citing *United States v. Salvo,* 133 F.3d 943, 953 (6th Cir. 1998)). Voluntariness is "a question of fact to be determined from all of the circumstances." *Id.* (citing *United States v. Schneckloth,* 412 U.S. at 248)). It is the government's burden

> by a preponderance of the evidence, to show through "clear and positive testimony" that valid consent was obtained. Several factors should be examined to determine whether consent is valid, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.

*United States v. Nappier,* 155 Fed. App'x 859, 866 (6th Cir. 2005) (citing *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996). Consent can be obviated by duress, coercion, or trickery.

In *Nappier,* 155 Fed App'x at 866, the defendant claimed that he did not voluntarily consent to the search of his home because he was in custody and ten or more law enforcement officers and a canine unit surrounded him. The court held that the district court had not clearly erred in finding that the defendant voluntarily consented because custody alone is not enough to demonstrate that consent was coerced. *Id.* There, defendant was familiar with the criminal justice system, and the defendant was read his *Miranda* rights. *Id.* at 867 (citing *United States v. Watson,* 423 U.S. 411, 425-26 (1973) (finding defendant voluntarily consented to search after considering the following factors: (1) no threat of force against defendant, (2) law enforcement made no promises, (3) consent given in public, (4) defendant was not a "newcomer to the law," (5) defendant was not mentally deficient, and (6) arresting officers administered *Miranda* warnings).

Here, Defendant asserts, without providing any facts to support the assertion, that his consent to the search of his vehicle was coerced. However, the government presented clear and positive testimony that Defendant's consent was voluntary, and the court credits this testimony. Specifically, like the defendants in *Nappier* and *Watson,* the evidence shows that the police did not threaten force against Defendant, Defendant was not a "newcomer to the law," Defendant was not mentally deficient, and Officer Dittmore administered *Miranda* warnings to Defendant. Moreover, Defendant demonstrated his awareness that he had the ability not to consent to a search of his car when he took steps to ensure that police presence in the vicinity of Defendant's vehicle would not "blow Defendant's cover" as a confidential informant. It was only after receiving police reassurances that he consented to the search. Accordingly, the court finds that, given the totality of the circumstances, the warrantless search of the vehicle was proper based on Defendant's voluntary consent.

### D. Search of Residence

Defendant states that the warrant to search his home was improper. Defendant argues that Sergeant Dittmore's affidavit is "based entirely on evidence obtained after the defendant's arrest without reasonable suspicion, and his statements that were made as a result of police promises." (Def.'s Supp. Mot. to Suppress at 6.) Therefore, Defendant argues that "the warrant was based on tainted information that was the result of constitutional violations" and was "not supported by other, independent means." (*Id.*) As stated above, the court finds that the police had reasonable suspicion to detain Defendant, the statements Defendant made to the police were voluntary, and Defendant voluntarily consented to the search of his vehicle. Accordingly, the court finds there is no basis to suppress the evidence recovered from Defendant's residence because the search warrant was based

on evidence obtained in a constitutional manner.

### III. CONCLUSION

For the above-stated reasons, Defendant's Motion to Suppress (ECF No. 10) and Supplemental Motion to Suppress (ECF No. 15) are denied.

IT IS SO ORDERED.

/s/*SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

December 26, 2007